UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

14-cv-_____

BOBBY FARID HADID,

Plaintiff,

**COMPLAINT**

-against-

THE CITY OF NEW YORK; RAYMOND W.
KELLY, in his Official Capacity as Police
Commissioner, City of New York; DAVID COHEN,
Individually and in his Official Capacity as Deputy
Police Commissioner for Intelligence, City of New York;
THOMAS GALATI, Individually and in his Official
Capacity as a Chief of the Intelligence Division,
WILLIAM BRATTON, in his Official Capacity as Police
Commissioner, City of New York; JOHN MILLER,
in his Official Capacity as Deputy Police Commissioner
for Intelligence, City of New York; CHARLES CAMPISI,
in his Individual and his Official Capacity as Commanding Officer,
Internal Affairs Bureau, New York City Police Department;
CHRISTOHER BROSCHART, in his Individual and his Official
Capacity as a Lieutenant of the New York City Police Department,
CHARLES HYNES, in his Official Capacity as District
Attorney, Kings County, New York; MELISSA CARVAJAL,
Individually and in her Official Capacity as Assistant District
Attorney, Kings County, New York; ELIZABETH MOEHLE,
Individually and in her Official Capacity as Assistant
District Attorney, Kings County, New York; "JOHN DOE" or
"JANE DOE" Individually and in his or her Official Capacity
as supervisory Assistant District Attorney, Kings County, New York.

Defendants.

-----------------------------------------------------------------------X

1

Plaintiff, Bobby Farid Hadid ("Hadid") by his attorneys, respectfully alleges as follows:

## INTRODUCTION

1.      Shortly after September 11, 2001, the New York City Police Department (the "NYPD") secretly began making daily lists of certain persons arrested for low level offenses in the New York City metropolitan area.   The lists consisted of individuals who were identified as potentially being Muslim or having a Middle Eastern background or origin based on the sound or spelling of the person's name.  Using those lists, the NYPD dispatched police investigators from its Intelligence Division to conduct special interrogations of such arrestees solely on the basis of their having been profiled as Muslim or of Middle Eastern origin. The interrogations were not about the low level offences that led to their arrests; the interrogations were about the individuals' Muslim or Middle Eastern backgrounds.

2.   Hadid was at all relevant times an NYPD Sergeant fluent in Arabic, who was one of several Intelligence Division officers leading a team of investigators conducting face-to-face interrogations of Muslim or Middle Eastern arrestees.  The arrestees were detained in precinct holding cells beyond the periods of time related to their arrests to accommodate Intelligence Division investigators. The Intelligence Division interrogators questioned the arrestees regarding their specific

religious affiliation within the Islamic faith, the nature and frequency of their religious practices, what mosques they attended, and the religious practices of their family members. These special interrogations were reported in official police reports, known as DD-5s, and had no relation to the arrest or any other legitimate law enforcement activity.   Instead, the reports were maintained as part of the Intelligence Division database on Muslims and individuals of a Middle Eastern national origin.

3.      When Hadid voiced concerns within the Intelligence Division about the propriety of interrogating persons solely about their religion, ethnicity, and national origin, in the absence of any law enforcement interest, the high ranking officials of the NYPD's Intelligence Division initiated a series of retaliatory and punitive measures against Hadid in effort to suppress and discredit any public disclosure he would make concerning the unlawful and secret profiling and interrogations. These retaliatory and punitive measures culminated in the NYPD and Kings County District Attorney officials' joint effort to prosecute Hadid on baseless charges of perjury.

4.      As set forth in greater detail below, the Defendants abused their power, position and influence to prosecute a baseless claim of perjury against Hadid.  Although one of the counts of perjury that the Defendants pressed against Hadid was sustained after a bench trial in the Supreme Court for the County of

Kings, that conviction was reversed and the indictment dismissed as a matter of

law by the Second Department in *People v. Hadid*, 121 A.D. 2d 811, 993 N.Y.S.2d

754 (2d Dept. 2014).  Although the bogus perjury charge was ultimately dismissed,

Hadid suffered severe financial and emotion damages caused by the Defendants'

abusive and retaliatory misconduct, including termination from the NYPD, denial

of unemployment benefits, and preclusion from comparable employment as result

of the conviction for alleged perjury.  Indeed, even after the conviction was

reversed, the NYPD Defendants, including Bratton and Miller, have continued the

NYPD's campaign to discredit and punish Hadid by publically labeling him a

"convicted perjurer," by refusing to consider his application for reinstatement after

the perjury conviction was unanimously dismissed as a matter of law, and by

effectively terminating his reinstatement application by ignoring it.

        5.      Through this action, Hadid seeks redress for the coordinated efforts by

high ranking officials within the NYPD and the Kings County District Attorney's

Office to silence, intimidate, threaten and retaliate against him for his questioning

and disclosure of the NYPD's unlawful policy and practice of religious profiling,

and suspicionless interrogation of Muslims and individuals from the Middle East

and maintaining intelligence dossiers on Muslims.  Hadid specifically seeks

reinstatement to NYPD with full restoration of rank, seniority, pay and benefits

from the time of his dismissal, as well as compensatory damages, punitive

damages, a declaratory judgment, and attorney's fees pursuant to 42 U.S.C. §

1983, 42 U. S. C. § 1985(3), and 42 U.S.C. § 1988 for violations of his civil rights.

## JURISDICTION

6.    This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C.

1985(3) and 42 U.S.C. § 1988, and the Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution.  Jurisdiction is founded upon 28

U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the New York common

law claims under its supplemental jurisdiction, as set forth in 28 U. S. C. § 1367.

## VENUE

7.    Venue is properly laid in the Eastern District of New York under

U.S.C. §1391(c), in that the City of New York is a municipal corporation in the

Eastern District of New York, and Defendant Charles Hynes was the District

Attorney of Kings County, New York within the Eastern District of New York.

## JURY DEMAND

8.    Plaintiff respectfully demands a trial by jury of all issues in this matter

pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

9.    Plaintiff, Bobby Farid Hadid ("Hadid"), was and is a resident of the

City and State of New York and is a naturalized citizen of the United States of

America.

10.     Defendant, the City of New York (the "City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

11.     The City maintains as one of its departments the NYPD, a duly authorized public authority and/or police department, authorized to perform all functions of a police department under the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the City.  At all relevant times, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation and conduct of all NYPD personnel.  In addition, at all relevant times, the City was responsible for ensuring that NYPD personnel obey the laws of the United States and New York State.

12.     Defendant, Raymond W. Kelly ("Kelly"), at all relevant times, was the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting and managing all members of the NYPD Intelligence Division and the Internal Affairs Division.  He is sued here in his official capacity.

13.     Defendant, William Bratton ("Bratton"), is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting and managing all members of the NYPD Intelligence Division and the Internal Affairs

Division.  He is sued here in his official capacity.

14.    Defendant, David Cohen ("Cohen"), at all relevant times, was the Deputy Police Commissioner for Intelligence for the City of New York with supervisory authority over the NYPD's Intelligence Division. In that role, Defendant Cohen oversaw the gathering and analysis of intelligence, and was responsible for recruiting, training and managing all members of the NYPD Intelligence Division.  He is sued here individually and in his official capacity.

15.    Defendant, John Miller ("Miller"), is the Deputy Police Commissioner for Intelligence for the City of New York with supervisory authority over the NYPD's Intelligence Division.  In that role, Miller oversees the gathering and analysis of intelligence, and is responsible for recruiting, training and managing all members of the NYPD Intelligence Division.  He is sued here in his official capacity and his individual capacity.

16.    Defendant, Thomas Galati ("Galati"), was at all relevant times a duly sworn police officer and the Chief of the Intelligence Division for the City of New York with supervisory authority over the NYPD's Intelligence Division. In that role, Galati reported directly to Defendant Cohen and oversaw the gathering and analysis of intelligence, and was responsible for recruiting, training and managing members of the NYPD Intelligence Division.  He is sued here in his official capacity and his individual capacity.

17.    Defendant Charles Campisi ("Campisi") was a duly sworn police officer of the NYPD, and at all relevant times was the Commanding Officer of the NYPD's Internal Affairs Bureau ("IAB"), acting under the supervision of the Commissioner of the NYPD. He is sued here in his official capacity.

18.    Defendant Christopher Broschart, was at all relevant times was a duly sworn police officer and a Lieutenant of the NYPD assigned to the 115th Precinct. He is sued in his individual and official capacities.

19.    Defendant Charles Hynes ("Hynes"), at all relevant times, was the District Attorney of Kings County, New York with supervisory authority over personnel and actions of the Kings County District Attorney's Office.  He is sued here in his official capacity.

20.    Defendant, Melissa Carvajal ("Carvajal"), was a duly sworn official of the Kings County District Attorney's Office and was acting under the supervision of the Kings County District Attorney, and is sued here individually and in her official capacity.

21.    Defendant, Elizabeth Moehle ("Moehle"), was a duly sworn official of the Kings County District Attorney's Office and was acting under the supervision of the Kings County District Attorney, and is sued here in her individual and official capacity.

22.    Defendant, "John Doe" or "Jane Doe," was a supervisory assistant

district attorney and a duly sworn official of the Kings County District Attorney's Office and was acting under the supervision of the Kings County District Attorney, and sued here in his/her individual and official capacities.

23.    At all times hereinafter mentioned the NYPD and Kings County District Attorney defendants, either personally or through their employees, were acting under color of state law under the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

24.    Each and all of the acts of the NYPD and Kings County District Attorney defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant the City of New York or the Office of the Kings County District Attorney.

## FACTUAL ALLEGATIONS

25.    Hadid was born in Algeria in 1967, immigrated to the United States in 1994 at the age of 27, taught himself English, and became a naturalized citizen of the United States.

26.    In response to the terrorist attacks of September 11, 2001, Hadid joined the NYPD in July 2002, and thereafter graduated from the NYPD Police Academy and became a sworn Police Officer.

27.    Hadid is fluent in French, speaks multiple dialects of Arabic, and was designated as a "Master Linguist" by the NYPD.

28.     After joining the NYPD, Hadid received several assignments within the NYPD, including:  patrol duties at the 84th and the 94th Precincts; acting as an undercover agent for the Citywide Vice Squad; and as a Detective assigned to the FBI-led Joint Terrorism Task Force ("JTTF") in New York City.

29.     Hadid's promotion to the rank of Detective on February 23, 2007, less than five years after joining the NYPD, demonstrates that Hadid was an exceptional and dedicated member of the service.

30.     At the JTTF, Hadid received a Top Secret security clearance through the FBI and was assigned to conduct highly sensitive investigations.

31.     During his assignment with the JTTF, which included undercover investigations, Hadid was instrumental in the successful investigation and prosecution of several cases, and was awarded a Meritorious Police Work commendation from Kelly for his work.

32.     In 2007, Hadid was given a special assignment by the NYPD to accompany two homicide detectives as a French-English translator in an investigation into a homicide that had occurred in Brooklyn in 2001.

33.     Hadid was promoted to Sergeant by the NYPD on December 21, 2007, and consistent with NYPD regulations requiring a minimum of six-months patrol experience for newly promoted sergeants, Hadid was re-assigned from the JTTF to uniformed patrol duties in the 115th Precinct in Queens.

34.    Soon after his assignment to patrol in the 115th Precinct, Cohen, as the head of the Intelligence Division, summoned Hadid to the Office of Deputy Commissioner for Intelligence at NYPD Headquarters, and informed Hadid that as a result of his exemplary work with the JTTF and his language fluency in Arabic, Hadid was immediately assigned to the Intelligence Division.

35.    For about eighteen months, from about January 2008 through about May 2009, Hadid worked at the Intelligence Division and supervised a team of NYPD investigators known as the Citywide Debriefing Unit within the Intelligence Division that conducted interrogations of persons identified as Muslims or of Middle Eastern origin who had been arrested for minor offenses.

36.    During this time, Hadid and members of his Citywide Debriefing Unit interrogated arrestees in NYPD holding facilities from a daily list created by the NYPD of arrestees who were likely Muslim and/or of Middle Eastern origin. The interrogations concern the arrestees' specific affiliations within the Islamic faith, whether they participated in pilgrimages to Mecca, what mosques they attended, and matters of religion, all of which had no bearing whatsoever on the offense for which they had been arrested, or on any suspicion of unlawful activity.

37.    After each interrogation, Hadid and his subordinates in the Citywide Debriefing Unit prepared reports on each interview of a Muslim or Middle Eastern arrestee on an NYPD Investigation Report form, known as a "DD-5," which was

then recorded into the Intelligence Division's computerized database.

38. During his time at the Intelligence Division, Hadid's Citywide Debriefing Unit prepared over 800 DD-5 reports of interrogations, not one of which, upon information and belief, resulted in a viable lead to terrorist activity or suspects, or furthered a criminal investigation.

39. In early 2009, at a meeting of Intelligence Division officials led by Captain Donald T. Powers, Hadid openly expressed his concerns about the propriety of the NYPD interrogating Muslim arrestees and in particular the recording of information about them even though the interrogations yielded no pertinent information that ought to be created or maintained in an intelligence database. Previously, Hadid had privately expressed these concerns to his direct supervisor and his colleagues at the Intelligence Division, and in particular Hadid articulated to his colleagues and his direct supervisor that the NYPD was a law enforcement agency with an obligation to investigate suspected criminal activity, not an espionage agency.

40. Promptly after Hadid openly voiced his concerns over the profiled interrogations of arrestees, Cohen, Galati, and other officials of the Intelligence Division initiated a series of retaliatory and punitive disciplinary actions against Hadid that generated numerous meritless Command Disciplines over a short period of time, thereby tainting an otherwise unblemished disciplinary record over the

previous six years with the NYPD.

41.     Promptly after Hadid openly voiced his concerns over the profiled interrogations of arrestees, Cohen, Galati, and other officials of the Intelligence Division also began creating and spreading false, derogatory and defamatory rumors maligning Hadid's integrity and character for the purpose of discrediting, marginalizing and punishing Hadid.

42.     In furtherance of Cohen's and Galati's plan to punish and discredit Hadid, on May 4, 2010, members of the Intelligence Division Inspections Unit took Hadid to a facility in Brooklyn where he was interrogated for several hours over bogus allegations that a handful of his reports could not be located and that he was allegedly encouraging his subordinates to file false reports.

43.     On about May 2009, Cohen and Galati abruptly removed Hadid from the Intelligence Division, and his computer password and identification card were immediately struck to bar Hadid access to any part of the Intelligence Division, including personal belongings on his desk in the highly secure and secret facility housing the Intelligence Division.

44.     On information and belief, Cohen and Galati personally ordered the immediate removal of Hadid from all aspects of the Intelligence Division because of Hadid's prior comments about the propriety of the Intelligence Division's activities directed against the Muslim and Middle Eastern communities in the City

and because of a concern and belief that Hadid had and/or would publically report the Intelligence Division's activities against Muslims and individuals from the Middle East.

45.     Upon his sudden removal from the Intelligence Division, Hadid was transferred back to patrol duties in the 115th Precinct in Queens where, in furtherance of the Defendants' scheme against Hadid, he was assigned to work the midnight shift, and promptly given a marginal evaluation by Defendant Broschart, who was a Lieutenant at the time assigned to the 115th Precinct, even though Hadid had consistently performed his duties at a level well in excess of the marginal rating given to him by Broschart.

46.     On October 15, 2010, Hadid was called by Defendant Carvajal to testify at a hearing in Kings County Supreme Court regarding his 2007 translation work in France for NYPD detectives investigating a homicide in Brooklyn.

47.     On October 27, 2010, Defendant Carvajal again called Hadid to testify at the trial of the defendant in the homicide regarding his assignment as translator for the investigating detectives in France.

48.     During the trial, the attorney for the homicide defendant manufactured a false claim about a relationship between the homicide defendant's girlfriend and Hadid, and suggested that Hadid had testified falsely at the trial.

49.     Although the homicide defendant was convicted of manslaughter,

upon information and belief, in January and February 2011, NYPD Internal Affairs investigators, at the direction of Campisi and under the encouragement of Cohen and Galati, conducted formal interviews of the homicide detectives as part of an "investigation" against Hadid for committing perjury at the hearing and trial and for allegedly having associated with a person associated with criminal conduct.

50.    On April 12, 2011 and at the direct urging, encouragement, and importuning by Cohen, Galati and Campisi, Hynes, as the Kings County District Attorney, obtained an indictment against Hadid for two felony counts of Perjury Second Degree and two felony counts of Perjury First Degree, for the malicious purpose of retaliating against Hadid and for the purpose of discrediting him in the event that any information he provided about the Intelligence Division's activities directed toward Muslims or persons of a Middle Eastern origin became public.

51.    As a result of his indictment, Hadid was arrested by IAB officers, who were acting at the direction and orders of Cohen, Campisi and Hynes, and as a result of his arraignment he was required to appear in court about seven or eight times before trial and to appear in the Supreme Court for trial proceedings on five additional days.

52.    At the direction of Hynes and after discussion and authorization from Defendant, John Doe or Jane Doe, Moehle commenced the bench trial against Hadid on the four counts of perjury on October 18, 2012.

53.     During the course of the trial and in furtherance of the Defendants' attempts to obtain a false conviction against Hadid, Moehle offered and introduced evidence from one of her witnesses that she knew and should have known was falsified, and she improperly suggested that Hadid had read and/or translated Miranda warnings to the homicide defendants' girlfriend in a malicious effort to prove that Hadid knew that the girlfriend was a suspect.

54.     During the course of the trial and in furtherance of the Defendants' attempts to obtain a false conviction against Hadid, Carvajal testified at the trial that Hadid had numerous contacts with the homicide defendant's girlfriend and made several follow up trips to Paris to pursue an amorous relationship with her.

55.     Upon information and belief, Carvajal based her testimony on conversation with the homicide defendant's attorney during the homicide trial.

56.     Neither Carvajal, Moehle, nor anyone else working on behalf of the Kings County District Attorney's Officer or the NYPD made any attempt to independently verify the allegation about Hadid's alleged contacts or trips to France, a gross and blatant departure from well-established prosecutorial standards that shows their actual malice.

57.     During the course of the trial and in furtherance of the Defendants' attempts to obtain a malicious conviction against Hadid, Carvajal falsely testified that the homicide defendants' girlfriend with whom Hadid was alleged to have a

romantic relationship was a "suspect" in the homicide investigation.

58.     After Carvajal's testimony about Hadid's alleged trips to France to meet the homicide defendant's girlfriend and alleged "suspect," Moehle contacted the homicide defendant's defense attorney who told her that the allegations against Hadid were trial puffery and had no basis in fact.

59.     During the course of the bench trial and in furtherance of the Defendants' attempts to obtain a malicious conviction against Hadid, neither Carvajal nor Moehle informed the trial court or Hadid's defense counsel that they had learned that Carvajal's testimony during the previous day's court session was false or that there was information that could show that Carvajal's testimony was false.

60.     On October 25, 2012, the trial judge found Hadid guilty of Perjury First Degree for his testimony at trial, and not guilty for his testimony at the pre-trial hearing, and on December 6, 2012, the trial judge sentenced Hadid to five years probation and imposed the required fines and penalties of $375.

61.     By a letter dated November 1, 2012, Hadid was formally given notice of his termination from the NYPD based on the felony conviction as of October 25, 2012, and thereafter he was denied any unemployment benefits due to the felony conviction.

62.     Hadid was abruptly rendered unemployed and unemployable because

of the sensationalistic media coverage of his perjury trial.

63.     Hadid, his wife and three young children were subjected to economic devastation and the humiliation caused by the conviction, which was manufactured by Defendants to discredit any disclosure Hadid may make regarding the secret and unlawful profiling of Muslim arrestees.

64.     After Hadid was terminated as a member of the NYPD, he publicly revealed the existence of the Intelligence Division's Citywide Debriefing Unit and the practice of interrogating detained Muslims or individuals of apparent Middle Eastern origin to gain information about their religious affiliations and practices.

65.     On May 10, 2014, the *New York Times* published an article about the Debriefing Unit, which included a photograph of Hadid and identified him as a source for the article.  A copy of the article is attached as Exhibit 1.

66.     The *New York Times* article featured Hadid's role in the story in its Quote of the Day for May 11, 2014: "Why are we asking, 'Are you Muslim? What mosque do you go to?' What does that have to do with terrorism?" with the "by line," Bobby Hadid, a former sergeant with the New York Police Department's Intelligence Division, on efforts to turn Muslims arrested for minor offenses into informants.

67.     On October 8, 2014, Hadid's perjury conviction was reversed and the indictment dismissed as a matter of law by a unanimous panel of the New York

State Appellate Division, Second Department, which held that the evidence at trial failed utterly to show that Hadid had committed perjury.

68.     On information and belief and notwithstanding the reversal of his conviction and the dismissal of the indictment, Defendant Miller, the successor to Cohen as the head of the Intelligence Division, continued the NYPD's retaliation actions against Hadid when he stated after the publication of the *New York Times* article and after the dismissal of the perjury conviction, that one should not credit the account of a "convicted perjurer."

69.     Immediately after his exoneration by the Second Department, Hadid, through his attorney, formally applied by letter dated October 21, 2014 for consideration by Defendant Bratton, as NYPD Commissioner, of Hadid's request to be restored to duty as provided by New York State law.  A copy of the October 21, 2014 letter is attached as Exhibit 2.

70.     By November 25, 2014, neither Hadid nor his attorney had received a response from the NYPD about Hadid's request for restoration to duty.

71.     Accordingly, on November 25, 2014, Hadid, through his attorney, submitted a second, follow up letter to Bratton, again requesting that the NYPD commence proceedings to consider Hadid's request for reinstatement to the NYPD. The November 25, 2014 letter is attached as Exhibit 3.

72.     As of the date of the filing of this Complaint, no official of the NYPD

has responded to Hadid's requests of October 21, 2014 and November 25, 2014 for restoration to employment.

73.     The actions by Bratton, Miller and the NYPD in refusing to even consider reinstatement of Hadid were taken in further retaliation against Hadid for his public expression of concern about unlawful and secret practices of the Intelligence Division, for his protected speech as a citizen to the *New York Times* in 2014, and to chill any further revelations of religious profiling by the Intelligence Division.

74.     Each one of the individual defendants sued herein, collectively and individually, while acting under color of state law, engaged in conduct that constituted a City policy, official act, custom, usage, practice, procedure or rule, which is forbidden by the Constitution of the United States, and caused Hadid damages.

75.     Each of the individual defendants has acted in concert based on a conspiracy, plan, scheme and agreement to punish Hadid for his conduct, and each defendant has aided and abetted the unlawful acts of the other individual defendants.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF FIRST AMENDMENT RIGHTS
## UNDER 42 U.S.C. § 1983

76.     Hadid repeats, reiterates and realleges each and every foregoing

allegation with the same force and effect as if fully set forth herein.

77.    The Defendants have violated Hadid's rights of free speech and free association protected under the First Amendment to the United States Constitution by intending to harm Hadid, and placing a chilling effect upon the exercise of such rights by Hadid and other persons as is their right, as provided by the U.S. Constitution.

78.    Before and after Hadid's arrest and suspension, the Defendants unconstitutionally imposed these prior restraints on Hadid's speech in an effort by Defendants to silence, intimidate, threaten and prevent Hadid from disclosing the existence and unlawful practices of the Citywide Debriefing Unit of the Intelligence Division to the media, to the public, or to other governmental agencies.

79.    The Defendants conspired and worked together in a coordinated effort to harass and intimidate Hadid in order to prevent his speech from being uttered.

80.    The aforementioned conduct resulted in a chilling effect on Hadid's speech thereby deterring and preventing speech from being uttered to the media and public at large and to ultimately discredit his speech when and if it were to be uttered by branding him a "convicted perjurer."

81.    The Defendants' actions violated Hadid's First Amendment right to speak out as citizen regarding a matter of public concern, which constituted a

fraud on the public and a breach of the public trust – namely unconstitutional religious profiling and creating and maintaining intelligence dossiers on persons simply because they were Muslim or were from the Middle East.

82.    All of the actions taken by Defendants following Hadid's suspension were directly in violation of his rights as secured by the First Amendment of the Constitution.

83.    Upon information and belief, Bratton, aided and abetted by Miller, refused to reinstate Hadid, and terminated his application for reinstatement, which would have otherwise been granted, because of Hadid's prior conduct and statements and because of speech to the *New York Times* relating to the Intelligence Division.

84.    Upon information and belief, Bratton and Miller objected to and interfered with Hadid's reinstatement application because of Hadid's prior speech to the *New York Times* relating to the Intelligence Division.

85.    As a result of the Defendants' conduct, they are each jointly and severally liable to Hadid for financial and emotion damages in an amount to be established at trial.

## SECOND CLAIM FOR RELIEF
## MALICIOUS AND FRAUDULENT PROSECUTION
## UNDER 42 U.S.C. § 1983

86.    Hadid repeats, reiterates and realleges each and every foregoing

allegation with the same force and effect as if fully set forth herein.

87.     The defendants, the City, Cohen, Campisi, Hynes, Carvajal, Moehle and John or Jane Doe, jointly and severally, maliciously initiated the perjury prosecution against Hadid without probable cause to believe the proceeding should or could succeed.

88.     The prosecution was terminated in favor of Hadid.

89.     As a result of the prosecution, Hadid's rights to liberty were restrained in violation of his constitutional rights.

90.     As a result of the aforesaid conduct by Defendants, Hadid was subjected to illegal, tainted and baseless prosecution without probable cause by the Defendants, who presented at trial purported evidence that Defendants had not investigated, and which was learned by Defendants during the course of the trial to be completely false.

91.     As a result of the foregoing, Hadid's economic viability was damaged, and he was humiliated and subjected to ridicule through the sensational media coverage of the false "evidence" presented by defendants at Hadid's trial.

**THIRD CLAIM FOR RELIEF**
**MALICIOUS ABUSE OF PROCESS**
**UNDER 42 U.S.C. § 1983**

92.     Hadid repeats, reiterates and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

93.     The Defendants employed regularly issued legal process to compel performance or forbearance of an act with the intent to do harm to Hadid without excuse or justification and in order to obtain a collateral objective that was outside the legitimate ends of that legal process, thereby causing a depravation of liberty to Hadid.

94.     As a result of the Defendants' conduct, they are jointly and severally liable to Hadid for financial and emotion damages in an amount to be established at trial.

### FOURTH CLAIM FOR RELIEF
### CONSPIRACY TO VIOLATE PLAINTIFF'S
### CIVIL RIGHTS UNDER 42 U.S.C. § 1983

95.     Plaintiff repeats, reiterates and realleges each and every foregoing allegation as if the same were more fully set forth at length herein.

96.     Defendants conspired and acted in concert to do whatever was necessary, lawful or not, to cause the arrest and prosecution of Hadid.

97.     Throughout the period of the conspiracy, the Defendants pursued their objectives with actual malice toward Hadid, with utter and deliberate indifference to, and disregard for, Hadid's rights under the Constitution and laws of the United States, without probable or reasonable cause to believe Hadid committed any crime or any other lawful basis for doing so.

98.     Pursuant to the conspiracy, the conspirators, and their employees,

agents and servants, intentionally, recklessly, negligently, and/or with complete

indifference to the rights of Hadid manufactured false evidence and failed to

disclose the use of false evidence to the trial court.

99.    As a result of the foregoing, Hadid was deprived of his liberty, was

denied fundamental constitutional rights, was publicly embarrassed and

humiliated, was caused to suffer severe emotional distress, and was forced to incur

substantial expenses.

**FIFTH CLAIM FOR RELIEF**
**CONSPIRACY TO VIOLATE PLAINTIFF'S**
**CIVIL RIGHTS UNDER 42 U.S.C. § 1985(3)**

100.    Plaintiff repeats, reiterates and realleges each and every foregoing

allegation as if the same were more fully set forth at length herein.

101.    The NYPD Defendants, the City, Cohen, Galati and Kelly, entered

into a conspiracy and agreement for the purpose of depriving Muslims and those of

Middle Eastern origin, directly and indirectly, of the equal protection of the laws

and the equal privileges and immunities under the law and have taken an act in

furtherance of that conspiracy and agreement, and as a result of that conspiracy,

which was joined in by the Kings County District Attorney Defendants (Hynes,

Carvajal, and Moehle), Hadid has been injured in his person and his property and

as been deprived of the rights and privileges of a citizen of the United States.

102.    As a result of the Defendants' conduct, Hadid has suffered financial

and emotional damages in an amount to be established at trial.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF
## RIGHT TO A FAIR TRIAL
## UNDER 42U.S.C. § 1983

103.   Plaintiff repeats, reiterates and realleges each and every foregoing allegation as if the same were more fully set forth at length herein.

104.   The Defendants denied Hadid a right to a fair trial by presenting false and fabricated evidence during Hadid's perjury trial.

105.   As a result of the Defendants' conduct, Hadid suffered financial and emotional damages in an amount to be established at trial.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF
## SUBSTANTIVE AND PROCEDURAL DUE PROCESS
## UNDER 42U.S.C. § 1983

106.   Hadid repeats, reiterates and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

107.   Despite the fact that Defendants Hynes, Carvajal, Moehle and John or Jane Doe made no attempt to investigate or verify allegations that Hadid made repeated trips to France or that he had numerous communications to pursue a romantic interest with the homicide defendant's girlfriend, they presented such evidence in court at trial against Hadid.

108.   Despite the fact that Moehle learned during the trial that the testimony of Carvajal was false, neither of them ever disclosed that fact to the trial court as required by legal ethics and the Constitution that mandates due process of law for one accused of a felony.

109.   As a result of the aforesaid conduct by the Defendants, Hadid was deprived of his substantive and procedural due process rights, as set forth in the Fifth and Fourteenth Amendments to the Constitution of the United States.

110.   As a result of the foregoing, Hadid was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was falsely convicted of a crime, terminated from employment and denied reinstatement after dismissal of the conviction by an appellate court, and was forced to incur substantial expenses.

## EIGHTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

111.   Hadid repeats, reiterates and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

112.   Defendants, collectively and individually, while acting under color of state law, engaged in unlawful conduct that constituted a policy, custom, usage, practice, procedure or rule of City, which is forbidden by the Constitution of the United States.

113.   The aforementioned customs, policies, acts, usages, practices,

procedures and rules of the City and the NYPD included, but were not limited to the profiling of people on the basis of religion and subjecting them to interrogations that collected information about their religious preferences and practices.

114.   Notice to the City as well as the existence of these entrenched and persistent unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as has been recently documented in a 2013 book entitled *The Enemies Within,* by Matt Apuzzo and Adam Goldman.

115.   The foregoing customs, policies, acts, usages, practices, procedures and rules of the City and the NYPD were the moving force behind the constitutional violations suffered by Hadid as alleged herein.

116.   The NYPD Defendants' deliberate indifference to proper training, supervising and/or disciplining of policy making officials such as Defendants Cohen, Galati, Miller, and Campisi, and constituted explicit and/or tacit approval of their illegal and unconstitutional conduct.

117.   As a result of the foregoing customs, policies, acts, usages, practices, procedures and rules of the City and the NYPD, Hadid was subjected to unlawful prosecution and conviction resulting in damage to his economic, social and professional viability, and the pursuit of a normal and healthy life with his wife and three children.

118.   Defendants Cohen, Galati, Bratton, Miller, Campisi, Broschart, Hynes, Carvajal, and Moehle, collectively and individually, while acting under color of state law, were directly, actively and personally involved in violating Hadid's constitutional rights.

119.   Each and every one of the defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Hadid's constitutional rights.

120.   The acts complained were a direct and proximate result of the usages, practices, procedures and rules of the City, the NYPD and the Kings County District Attorney that constituted deliberate indifference to the constitutional rights of Hadid.

121.   The foregoing customs, policies, acts, usages, practices, procedures and rules of the City, the NYPD, and the Kings County District Attorney were the direct and proximate cause of the constitutional violations suffered by Hadid as alleged herein.

## NINTH CLAIM FOR RELIEF
## FOR MALICIOUS PROSECUTION[1]

122.   Hadid repeats, reiterates and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

123.   The Defendants are liable to Hadid for false arrest and for malicious prosecution under the common law of the State of New York.

124.   As a result of the defendants' conduct, Hadid has suffered financial and emotional damages in an amount to be established at trial.

## TENTH CLAIM FOR RELIEF
## MALICIOUS ABUSE OF PROCESS

125.   Hadid repeats, reiterates and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

126.   The Defendants are liable to Hadid for malicious abuse of process under the common law of the State of New York.

127.   As a result of the Defendants' conduct, Hadid has suffered financial and emotional damages in an amount to be established at trial.

---

[1] Since Hadid is concurrently with the preparation and filing of this Complaint also filing a Notice of Claim against the City and the other defendants under the Municipal Law, the Ninth, Tenth and Eleventh Claims for Relief, which are state law claims, are being conditionally asserted in the Complaint for the purpose of providing all the Defendants with notice that these claims are going to be asserted in this action and for the purpose of avoiding any claim of waiver.

## ELEVENTH CLAIM FOR RELIEF
## FOR FALSE ARREST

128.   Hadid repeats, reiterates and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

129.   The Defendants falsely arrested Hadid without probable cause to believe that he had committed perjury and as a result Hadid was denied his liberty.

130.   As a result of the Defendants' conduct, Hadid has suffered financial and emotional damages in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Hadid respectfully demands the following relief:

A.   Compensatory damages in an amount to be determined at trial;

B.   Punitive damages in an amount to be determined at trial;

C.   Declaratory judgment in favor of Hadid and against each of the Defendants, finding that the Defendants' conduct was unlawful, including without limitation, findings that the claims for relief have been established and that the practices and policies of the NYPD on religious profiling for collecting and maintaining intelligence dossiers were unlawful;

D.   An award of reasonable attorney's fees pursuant to 42 U.S.C. § 1988, as well as costs and disbursements; and

E.   Any further relief as the Court may find just and proper.

31

Dated:  New York, New York
        January 5, 2014

                                    BY:        *s/NBS*
                                            _____
                                            NATHANIEL B. SMITH
                                            Attorney for Plaintiff
                                            111 Broadway, Suite 1305
                                            New York, New York 10006
                                            (212) 227-7062
                                            natbsmith@gmail.com


                                    BY:        *s/JL*
                                            _____
                                            JOHN D. LENOIR
                                            Attorney for Plaintiff
                                            111 Broadway, Suite 1305
                                            New York, New York 10006
                                            (212) 227-7062
                                            john.lenoir@gmail.com